IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 13-03041-02-CR-S-DGK |
| RENDY CONANT, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

Before the court are defendant's motions to suppress evidence seized from her residence and from a storage unit during three separate searches all conducted after search warrants were obtained (document numbers 39 and 52). I find that (1) it was objectively reasonable for the officers executing the search warrant at defendant's residence to have relied in good faith on the judge's determination that there was probable cause to issue the warrant; (2) the warrant was not overbroad nor was it lacking in specificity; (3) there is no credible evidence that the police did not knock and announce their purpose; (4) a copy of the search warrant was left at the jail where defendants had been taken during the search and, even if the warrant should have been left at the residence, suppression of the evidence seized is not a proper remedy; (5) defendant has no standing to challenge the search of the storage unit; and (6) the evidence seized from the storage unit does not amount to fruits of any illegal search. Therefore, defendant's motions to suppress should be denied.

## I.  BACKGROUND

On July 16, 2012, Officer Victor Weir applied for a search warrant for defendant's home at 609 Sunset Drive, Waynesville, Missouri.  The affidavit in support of the search warrant included the following probable cause statement:

> On 7/15/12 CI 2011-12-2 who has proven reliable in the past on six separate occasions, gave me information that Methamphetamine is being distributed from and stored at this location.  CI 2011-12-2 told me that James Rhodenizer who lives at 723 East Main Street in Richland, purchases quantities of Crystal Methamphetamine from Bruce and Rendy Conant who reside and own the property at this address and is in Pulaski County, MO.  It is further stored in a storage unit located off the 140 mile marker of I-44 in Laclede County.  A search warrant was executed in Pulaski County and in the city of Richland on 6/23/12 and the CI advised me that the crystal methamphetamine found in Mr. Rhodenizer's possession was purchased from Bruce and Rendy Conant by James Rhodenizer.  CI 2011-12-2 stated that there is enough on hand for sales; however the bulk is stored at the storage shed in Laclede County.  CI 2011-12-2 further stated that on or about 07/12/12 the Conant's [sic] brought a new supply of methamphetamine to the area.

The search warrant was issued and executed that same day, and police recovered methamphetamine, digital scales, a large quantity of sophisticated surveillance equipment, approximately $80,000 in cash, documents, and other items.  One of the documents seized was a statement from Mid-Town Storage for Unit 33 for the month of June 2012.  It was billed to co-defendant Bruce Conant at the residence that had just been searched.  In addition, jail personnel seized from Bruce Conant's wallet a SecuraKey for Mid-Town Storage in Lebananon, Missouri, which is in Laclede County.

The following day, a search warrant was obtained by Detective John Young and executed on the storage unit where police recovered a revolver, $329,780[1] in cash, and other items associated with drug manufacture and distribution. There were two affidavits in support of that warrant -- one by Detective John Young and one by Officer Victor Weir. The affidavit signed by Detective Young includes the following:

> On July 16, 2012 I was notified that a subject identified as Bruce R. Conant was concealing a large amount of methamphetamine and U.S. currency within his residence located in Pulaski County, Mo. I was also notified that Bruce R. Conant was concealing methamphetamine and currency within a storage unit located at 210 Clough St. unit #33, Lebanon, Laclede County, MO. A search warrant was executed upon the residence in Pulaski County, Mo. On July 17, 2012 large quantities of methamphetamine and currency were seized from the residence of Bruce R. Conant. Also seized was a receipt for Mid-Town Storage unit #33 for June 2012[2] rent. The receipt was signed by "Bonnie". A magnetic key card/fob was located in the wallet of Bruce R. Conant for Mid-Town Storage. Mid-Town Storage uses a card unlike other storage facilities in the surrounding area.
>
> On July 17, 2012 approximately 0200 hours I contacted Lebanon Police officer Ralph Robinson to assist by using his K-9 Dax to check unit #33 at Mid-Town Storage. Officer Robinson and his K-9 arrived at 210 Clough Lebanon Laclede County, Mo. . . . The K-9 Dax indicated on Unit #33 by scratching and barking. Officer Robinson pulled the K-9 back and walked down the row of unit[s] again. The K-9 Dax indicated again on unit #33.

---

[1]This dollar figure came from the government's response. The search warrant inventory does not include a total but lists "cash bundles" (P. Ex. 3). There does not appear to be a dispute over the amount seized.

[2]Elsewhere the receipt is said to have been for May 2012 rent; however, I find the discrepancy immaterial. The statement is actually dated May 20, 2012, and it shows that the rent was due June 1, 2012.

The affidavit prepared by Officer Weir includes the following:

> On 07/15/12 I executed a search warrant at 609 Sunset Dr. in Waynesville, MO and in Pulaski County, MO. The search warrant was based on information from a reliable confidential informant. The residence was owned and occupied by Bruce and Rendy Conant. The result of the search revealed over $80,000 in Currency and approximately 116 grams of Crystal Methamphetamine. The CI also told me that a large quantity of Crystal Methamphetamine was held at a storage facility in Laclede County, MO. While searching I discovered a receipt for a storage facility in Lebanon, MO and within Laclede County. The facility was Mid-Town Storage and the unit was #33. Bruce Conant had a Secure Key security access card in his wallet.

On July 22, 2012, Officer Weir applied for a second search warrant for defendant's residence. The affidavit in support of that warrant includes the following:

> On 07/19/12 CI 2012-04, who has personal knowledge of the residence described above, was told by Rendy Conant that there was $125,000 in the walls and/or buried in the ground at the above-described residence, owned by Bruce and Rendy Conant. On 07/16/12 a search warrant was executed on this residence and approximately 116 grams of a substance field testing positive for methamphetamine and having a crystalline structure were found and seized along with approximately $84,000 in U.S. Currency. The $61,000.00 of the U.S. Currency was hidden in plastic PVC pipes with removable endcaps with cash hidden inside them at the residence that contained approximately $61,000. On 07/17/12 a joint search warrant was executed in Laclede County at a storage unit rented by Bruce and Rendy Conant, in which approximately $300,000 in U.S. Currency was seized along with a loaded firearm and drug paraphernalia and some of the cash seized was in a plastic PVC pipe. Based upon the packaging of the U.S. currency that was found, and the extent of the knowledge of the Conant's by the Confidential Informant, I believe that there is additional U.S. Currency hidden in the walls of the residence. . . .

No additional currency was found during this search; however, a small amount of methamphetamine was found.

On May 8, 2013, an indictment was returned charging defendant with conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine.  The indictment also charges co-defendant Bruce Conant with possessing a firearm in furtherance of a drug trafficking crime and possessing a firearm after having been convicted of a felony.

On August 26, 2013, defendant Rendy Conant filed a motion to suppress (document number 39) and on September 10, 2013, she filed an amended motion to suppress (document number 52).  On October 15, 2013, the government filed a response (document number 55) in opposition.  On October 29, 2013, this case was transferred to me for processing.

I held a hearing on defendant's motions on January 28, 2014.  Defendant appeared in person, represented by Tyce Smith.  The government was represented by Assistant United States Attorney Ami Miller.  The following witnesses testified:

1.   Officer Victor Weir, Waynesville, Missouri, Police Department

2.   Detective John Young, Laclede County Sheriff's Office

The following exhibits were admitted:

P. Ex. 1  Search warrant dated July 16, 2012

P. Ex. 2  Mid-Town Storage Statement

P. Ex. 3  Search warrant dated July 17, 2012

P. Ex. 4  Search warrant dated July 22, 2012

P. Ex. 5  Dog certification

## II. FINDINGS OF FACT

Based on the evidence presented during the hearing, I make the following findings of fact:

1.    Officer Victor Weir, Waynesville, Missouri, Police Department, has been in law enforcement for 14 years during which he received 470 hours of initial training and in excess of 48 hours of continued training every three years (Tr. at 6).  He received 40 hours of narcotics investigation training through the Missouri Highway Patrol, and he has received training in how to interview and deal with confidential informants (Tr. at 7–8).  Officer Weir has been a patrolman but in July 2011 he began working in narcotics as well (Tr. at 6).  During the course of his career, Officer Weir has applied for in excess 50 search warrants, and he has worked with approximately 50 confidential informants (Tr. at 7, 8).  He has been a part of 300 or more drug investigations (Tr. at 7).  When Officer Weir uses information from a confidential informant to get a search warrant, he determines whether the informant knows the information first–hand or whether the informant heard the information from some other source, but Officer Weir does not always make that distinction in his affidavits (Tr. at 29–30).

2.    Detective John Young, Laclede County Sheriff's Office, has been in law enforcement for 17 years (Tr. at 75).  He initially had 470 hours of training through the Sheriff's Academy, and has received continuing education or training (Tr. at 75).  He has authored "numerous" affidavits in support of

search warrants, and he has worked on narcotics cases "numerous" times (Tr. at 76).

3.    During the summer of 2012, Officer Weir was asked to investigate an alleged first-degree assault in which someone tried to crucify Travis Pierce in his mobile home in the Crocker area (Tr. at 9).  Mr. Pierce lost a toe during the incident which was allegedly the result of a dispute over methamphetamine from James Rhodenizer (Tr. at 9).  Through his investigation Officer Weir learned[3] that Rhodenizer was distributing marijuana and methamphetamine (Tr. at 9).  Rhodenizer's associate, James Moore, had multiple locations[4] from which drugs were being distributed -- one off T Highway; one off Riverside Drive in Pulaski County, which is about a mile from Mr. Moore's residence; and one at 723 East Main Street in Richland (Tr. at 9).  All of these locations are in Pulaski County (Tr. at 9).

4.    An informant told Officer Weir that defendants Bruce and Rendy Conant had sold approximately "an ounce or more" of methamphetamine to Rhodenizer (Tr. at 10).

5.    Officers executed search warrants on multiple addresses:  "There were two residence[s] -- four residences and a

---

[3]Officer Weir did not testify how he learned this information, but his subsequent testimony dealt with information from confidential informants (Tr. at 10).

[4]Officer Weir testified that Moore had "two" locations; however, he then listed three:  "one off T Highway, one off Riverside Drive in Pulaski County . . . [a]nd then there was a residence 723 East Main Street in Richland in which they were being distributed at well." (Tr. at 9).

shop building.  There was three property locations.  There was --
Riverside Drive there was a trailer, a house, and a storage
building, a shop building, on T Highway, which was James Moore's
actual house, and then James Rhodenizer's house." (Tr. at 10).
Two of the confidential informants who provided information to
obtain these search warrants also provided information to police
about defendants (Tr. at 10).  One of these informants provided
information directly to Officer Weir and was an informant with
whom Weir had worked before (Tr. at 11).

6.    During execution of a search warrant on James
Rhodenizer's home on June 28, 2012, methamphetamine was recovered
(Tr. at 11, 37, 43).  A confidential informant told police that
the methamphetamine recovered from Rhodenizer's residence had
been purchased from defendants (Tr. at 11, 13).  The informant
had gotten this information not through first-hand knowledge but
from another informant who had seen the drugs there (Tr. at 46).
The informant said that every few weeks defendants were making a
trip to Kansas City to pick up methamphetamine (Tr. at 12).  The
informant stated that defendants stored drugs in a storage unit
located off mile marker 140 on I-44 in Laclede County, and that
there may be more than one storage unit but the informant did not
know the particular locations (Tr. at 21-22, 61, 93, 95, 101).
The informant had gotten this information from someone who had
personal knowledge of this fact, and the person who told the
informant this had seen drugs within a week of providing this
information (Tr. at 46, 50-51, 52).  Officer Weir contacted

Detective John Young in Laclede County (which is outside the jurisdiction of the Waynesville Police Department), a narcotics investigator (Tr. at 22). Officer Weir provided this information about the storage unit to Detective Young because mile marker 140 on I-4 was in Young's jurisdiction (Tr. at 23, 52, 76).

7.  Officer Weir only provided information about the storage locker to Detective Young, he did not go to mile marker 140 to look for a storage unit because that is outside his jurisdiction (Tr. at 22, 36). He did go to the courthouse and city hall to verify that the residence and the utilities were in the name of Bruce and Rendy Conant (Tr. at 41). However he later spoke to the other informant who had first-hand knowledge of these facts regarding defendants' drug possession (Tr. at 53). Officer Weir asked the informant about the drugs observed at defendants' residence, but he did not ask about the storage unit (Tr. at 53-54).

8.  Officer Weir had ongoing conversations with Detective Young in Laclede County about storage facilities prior to seeking any search warrants (Tr. at 76-77). Detective Young knew of a storage facility at mile marker 140, and he went to that facility several times (Tr. at 88). He attempted through confidential sources to determine whether defendants had a storage unit at this facility (Tr. at 89). He did not take a drug dog to the facility or talk to the owners due to ongoing-investigation concerns (Tr. at 89).

9.   On July 16, 2012, Officer Weir applied for a warrant to search defendants' home (Tr. at 14–15).  In the affidavit, Officer Weir referred to the information that had been provided by the first confidential informant, but not the information that had been provided by the second confidential informant with first-hand knowledge (Tr. at 31).  In the affidavit, Officer Weir did not say where the confidential informant got the information that was shared with law enforcement (Tr. at 31–32).  The prosecuting attorney (Ken Clayton) knew the informant's information was not based on first-hand knowledge, but he did not instruct Officer Weir to make that distinction in the affidavit (Tr. at 38–39).  The prosecuting attorney also did not point out any problem with the lack of information in the affidavit establishing the reliability of the informant (Tr. at 39–40).  The informant who provided the information for the warrant was working off a case; and although the prosecutor was aware of this, that information was not included in the affidavit (Tr. at 46).  At the time the informant was providing information, no promises had been made regarding reducing or dismissing charges against the informant (Tr. at 60).  The prosecutor said he would look at the totality of the assistance, but no promises had been made to the informant (Tr. at 62).

10.  Officer Weir stated in the affidavit that the informant had proven reliable on six separate occasions (Tr. at 15; P. Ex. 1).  Excluding the Rhodenizer search warrants, this confidential informant had proven reliable in at least three other search

warrants in which narcotics had been found and three other consensual searches (Tr. at 15–16). Officer Weir provided the information about defendants to acting prosecutor Ken Clayton (Tr. at 16). Officer Weir then met with Mr. Clayton and drafted the search warrant documents (Tr. at 16). Officer Weir provided Mr. Clayton with additional information, but he did not want to include that in the affidavit due to concerns over the safety of the confidential informant (Tr. at 16, 23). Mr. Clayton reviewed the affidavit and proposed search warrant that had been prepared by Officer Weir (Tr. at 16).

11. Officer Weir had worked with Mr. Clayton in the past, and there had been occasions in the past when Mr. Clayton denied a search warrant application because there was not enough information in the application to establish probable cause (Tr. at 17). On those occasions, Mr. Clayton told Officer Weir to gather more information (Tr. at 17). However, when Officer Weir provided Mr. Clayton with the application and affidavit for a warrant to search defendants' residence, Mr. Clayton signed the affidavit and forwarded it to the judge (Tr. at 17–18). Officer Weir did not speak to Judge Storie when the search warrant for defendants' residence was obtained (Tr. at 16, 18; P. Ex. 1).

12. Officer Weir was present on July 16, 2012, when the search warrant was executed at defendants' residence (Tr. at 18). The defendants were home (Tr. at 40). In the office area of the home, Officer Weir recovered coins, a fake book with methamphetamine inside, a smoking device, and a black box with approximately

$18,000 cash and more methamphetamine (Tr. at 19).  Officer Weir also found a statement for a storage rental unit at Mid-Town Storage in defendants' office area (Tr. at 20; P. Ex. 2).  The only address was a P.O. Box, so he pulled it up on Google and "it showed it as possibly being at the 140 mile marker." (Tr. at 24).  He called Detective Young who also thought Mid-Town Storage could be at mile marker 140 (Tr. at 24, 56, 77-78).  The officers executing the search warrant seized computers, vehicles (including one at a different location), coin collections, etc., because "there was a great possibility that they had been purchased through use of drug funds" and, after a drug dog had alerted on the cars, Officer Weir believed they had been used to transport illegal drugs (Tr. at 57, 68).  The car that was at a different location was at a repair shop, and it was the subject of a K-9 search (Tr. at 57, 69).  The dog alerted positively to the car before it was seized (Tr. at 57).  A dog also alerted to two cars at the residence which were searched, but nothing was found inside them (Tr. at 65-66, 68).  The dog is NAPWDA[5] certified (Tr. at 68).  Once the cash and drugs had been found, DEA agents showed up and determined that the case would likely be handled by them, and they took custody of the evidence (Tr. at 59).

13.  Both of the defendants were arrested and taken to jail, and a copy of the search warrant was left at the jail for them

---

[5]North American Police Work Dog Association.

(Tr. at 66, 70).

14.  Detective Young drove out to exit 140 and started looking for the Mid-Town Storage facility (Tr. at 78).  He did not find it there (Tr. at 78).  He started driving around trying to locate a storage facility named Mid-Town (Tr. at 78).  He eventually located it at 210 Clough in Lebanon which is in Laclede County (Tr. at 78).  He contacted the Pulaski County officers to see if there had been a magnetic strip card in the property seized from defendant's residence, because this storage facility was a secure facility which used cards with magnetic strips for access to the main gate (Tr. at 79).  Detective Young learned that a magnetic strip card had been found in Bruce Conant's wallet at the jail after his arrest (Tr. at 79).  A law enforcement officer brought the card to Detective Young who used it to open the front gate of the storage facility (Tr. at 79).  He then requested the Lebanon Police Department to send a K-9 to the storage facility (Tr. at 79-80).

15.  Dax, a police dog certified in the detection of methamphetamine, cocaine, heroin and marijuana, was brought to the storage facility (Tr. at 80; P. Ex. 5).  Dax was walked up and down the row of units, and he scratched and barked at unit 33 (Tr. at 81, 102-103).  He was pulled away from the door of unit 33, taken to the beginning of the row, and walked down the row again (Tr. at 81).  Again, he alerted on unit 33 (Tr. at 81).  Dax did not alert on any other unit (Tr. at 81).  Detective Young notified Officer Weir of these findings, and then he began the

process of applying for a search warrant for the unit (Tr. at 81).

16.  Detective Young prepared an affidavit and contacted Jon Morris, the prosecuting attorney (Tr. at 82).  The affidavit states that Young was notified that Bruce Conant was concealing methamphetamine and currency within a storage unit located at 210 Clough Street, Unit 33, Lebanon.  Young was indeed notified of all of this information except the exact street address of the Mid-Town Storage facility —— he discovered that through his own investigation (Tr. at 90-92).  After Mr. Morris reviewed Detective Young's documents, Mr. Morris requested an additional affidavit from Officer Weir about the execution of the search warrant at defendants' residence (Tr. at 82-83).  Because Officer Weir had been involved in that search warrant, Mr. Morris believed that Officer Weir should provide that information by way of an affidavit (Tr. at 24, 83).

17.  Officer Weir was not the affiant who originally prepared an application for a warrant to search the Mid-Town Storage unit because it was located outside his jurisdiction (Tr. at 23).  Once Officer Weir's affidavit was reviewed and approved by Mr. Morris, all of the documents were taken to Judge Larry Winfrey who issued a warrant to search the storage unit based solely on the information contained in the affidavits (Tr. at 83-84).

18.  When the search warrant was executed, Officer Weir was present but did not conduct the search (Tr. at 25).  Detective

Young was also present (Tr. at 84).  The Lake Area Narcotics

Enforcement Group conducted the search and those officers seized

a suitcase, two plastic tubes, cash bundles, and an unlocked

black case containing a .38 revolver (Tr. at 84–85, 98–99, 104).

Near the revolver was an item containing methamphetamine residue

(Tr. at 96–97).  Also recovered were five glass devices, with

residue, used to ingest methamphetamine (Tr. at 97).

19.  Following the searches, an informant told Officer Weir

that the police had missed $125,000 during the original search of

defendants' residence (Tr. at 25).  The informant said the money

was either hidden in the walls of the house or buried in tubes in

the back yard (Tr. at 25).  On July 19, 2012, Officer Weir

prepared an affidavit in support of a second search warrant for

the residence and presented it to Ken Clayton, the prosecuting

attorney, who reviewed it before they took it to a judge (Tr. at

27).  When the warrant was executed, police did not find any more

money at defendants' residence (Tr. at 36).  However, they did

seize a small amount of methamphetamine from the garage (Tr. at

58–59).

20.  Ray's Self Storage is located on the north side of exit

140 at I–44 on the north outer road (Tr. at 106).  It is about

100 yards from the outer road junction of the exit (Tr. at 106).

Mid–Town Storage Facility is about 13 miles down the interstate

from exit 140, and then another mile and a half from the

interstate (Tr. at 106).  Ray's was the only storage facility at

mile marker 140 in July 2012 (Tr. at 107).

### III. PROBABLE CAUSE

For a search warrant to be valid, it must be based upon a judicial finding that there is probable cause, that is, a "fair probability" to believe that the listed items may be found at the place to be searched. <u>Illinois v. Gates</u>, 462 U.S. 213, 232, 246 (1983). Such a determination is to be based upon the "the totality of the circumstances." <u>Id</u>. at 238. In other words, the task of the issuing magistrate is to make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id</u>.

The issue of probable cause need not be addressed because I find that the good-faith exception to the exclusionary rule applies here. Even if I were to agree with defendant that Officer Weir's original affidavit failed to establish probable cause to search defendant's residence, the evidence would nonetheless be admissible under the <u>Leon</u> good-faith exception to the exclusionary rule. <u>United States v. Leon</u>, 468 U.S. 897, 920-921 (1984). Under the <u>Leon</u> good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant. <u>United States v. Hager</u>, 710 F.3d 830, 837 (8th Cir. 2013); <u>United States v. Patten</u>, 664 F.3d 247, 251 (8th

Cir. 2011); United States v. El-Alamin, 574 F.3d 915, 924 (8th Cir. 2009). When assessing the objective reasonableness of police officers executing a warrant, the court must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge. United States v. Hager, 710 F.3d at 837; United States v. Houston, 665 F.3d 991, 995 (8th Cir. 2012); United States v. Proell, 485 F.3d 427, 431 (8th Cir. 2007).

In this case, defendant argues that the statement that the informant "has proven reliable in the past on six separate occasions" is insufficient to permit a finding of probable cause because (1) there is no indication that the previous information was related to criminal activity, and (2) there is no other basis for a finding that the informant was reliable. However, in this case, police knew that the informant had provided information on six occasions which resulted in seizure of illegal drugs through three search warrants and three consensual searches. Therefore, the alleged "ambiguity" in the affidavit -- i.e., that the information that had proved reliable in the past on six separate occasions was not necessarily related to criminal activity -- does not warrant suppression of the evidence seized pursuant to that warrant because the police knew that information to have been related to criminal activity.

The Eighth Circuit has recognized situations, however, which preclude a finding of good faith: (1) when the affidavit or testimony supporting the warrant contained a false statement made

knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. United States v. Cannon, 703 F.3d 407, 412 (8th Cir.), cert. denied, 133 S. Ct. 2375 (2013); United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011), cert. denied, 132 S. Ct. 1713 (2012); United States v. Perry, 531 F.3d 662, 665 (8th Cir. 2008).

(1)  The first exception was already addressed in the separate motion for a Franks hearing and will not be repeated here.  Defendant argues that Detective Young did not receive information that defendants concealed anything in the storage unit; however, the evidence establishes that he received information that defendants were storing methamphetamine in a storage locker, a receipt for a storage locker was found in her residence, Bruce Conant (her husband) had an access key to the storage facility, a drug dog alerted on the unit assigned to Bruce Conant, and Detective Young had determined the street address of that facility.  The fact that defendants used another storage facility years earlier is not relevant considering all of the above and the fact that the informants had indicated that defendants had several storage units.

(2)  There is no evidence that the issuing judge wholly abandoned his judicial role in issuing the warrant.  In <u>United States v. Decker</u>, 956 F.2d 773 (8th Cir. 1992), the Eighth Circuit found that the judge issuing a warrant had wholly abandoned his judicial role by issuing a warrant without ever having read it:

> The warrant's glaring omission of the items to be seized supports the district court's finding that the issuing judge never read it.  The judge's failure to strike the words "unlawfully stolen" from the warrant further supports this conclusion.  The same can be said regarding the judge's failure to ensure that the prosecutor had signed the warrant, as required by Missouri law.  Moreover, the judge himself admitted that he issued "the search warrant on the strength of what the officer told me," as opposed to relying on the written warrant and affidavit.
>
> We thus conclude that the district court did not clearly err in determining that the issuing judge failed to act in a detached and neutral manner.

On the contrary, there is no evidence (indeed no allegation) in this case that the issuing judge wholly abandoned his judicial role.

(3)  The third situation precluding a finding of good faith –– when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable –– is the most problematic.  The affidavit in this case consists of one paragraph.  It states that a confidential informant had "proven reliable" in the past on six separate occasions, but it does not state that the informant had provided reliable information about *criminal activity* or that the information provided in this instance by the informant was *not*

based on first-hand knowledge.  That information, however, was known by Officer Weir.

The affidavit states that the bulk of defendant's drugs are kept in a storage locker; however, this affidavit was offered in support of a warrant to search defendant's residence, not a storage locker.  The affidavit states that "there is enough on hand for sales" –– it can only be inferred that this means there is enough *methamphetamine* on hand *at defendant's residence* for sales.  I have struggled with this case, because the affidavit relies very heavily on such inferences.  It does, however, state that Rhodenizer purchases methamphetamine from defendants, and it indicates that methamphetamine was seized from Rhodenizer on June 28, 2012.

Under United States v. Leon, 468 U.S. 897 (1984), the question of whether an officer's reliance on an issued warrant was objectively reasonable is a question of law, and courts may deny suppression motions "posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith."  United States v. Leon, 468 U.S. at 925. The Supreme Court in Leon clearly anticipated that the good-faith exception to the exclusionary rule would, in most cases, prevent suppression of evidence seized pursuant to invalid warrants because it noted that a neutral magistrate's intervention in the "competitive enterprise of ferreting out crime" provides adequate protection of Fourth Amendment rights in many cases.  The Court, citing Illinois v. Gates, 462 U.S. at 267, and United States v.

Ross, 456 U.S. 798, 923, n. 32 (1982), noted that exceptions

would be few when it stated that:

> searches pursuant to a warrant will rarely require any deep
> inquiry into reasonableness, for a warrant issued by a
> magistrate normally suffices to establish that a law
> enforcement officer has acted in good faith in conducting
> the search.

United States v. Leon, 468 U.S. at 922.

With that in mind, I note a similar case wherein the Eighth

Circuit found the good-faith exception applicable.  In United

States v. Carpenter, 341 F.3d 666 (8th Cir. 2003), the defendant

challenged a search warrant whose affidavit stated that the

informant had a relationship with "Christie" such that the

informant could know detailed information about Christie's drug

dealings.  The defendant likened the affidavit to that in Aguilar

v. Texas,[6] 378 U.S. 108 (1964).

> In Aguilar, unlike the present case, there was no
> information to explain why the officer believed the
> informant to be reliable, no information to demonstrate that
> the informant had knowledge of innocent facts related to the
> suspect, no description –– numerical or functional –– of
> drug quantity, and no statement as to the existence of a
> relationship between the [informant] and the suspect that
> would explain the [informant's] knowledge. . . .  United
> States v. Wright, 145 F.3d 972, 974-75 (8th Cir. 1998) ("The
> statements of a reliable confidential informant are
> themselves sufficient to support probable cause for a search
> warrant. . . .  The reliability of a confidential informant
> can be established if the person has a history of providing
> law enforcement officials with truthful information.").
> Because, under Leon, we do not conduct a de novo review of

---

[6]The affidavit in Aguilar read as follows:  "Affiants have
received reliable information from a credible person and do
believe that heroin, marijuana, barbiturates, and other narcotics
and narcotic paraphernalia are being kept at the above described
premises for the purpose of sale and use contrary to the
provisions of the law."

the probable cause determination, we need not parse this distinction more finely. It is sufficient to note that Carpenter raises a close question concerning a legal deficiency. On such issues, officers may reasonably rely on the judgment of the issuing magistrate. We note, in addition, that <u>Aguilar</u>, as a rule of law standing on its own, has been superseded by the <u>Gates</u>[7] "totality of the circumstances" approach.

<u>United States v. Carpenter</u>, 341 F.3d at 671.

In this case, a prosecutor signed off on the search warrant, and a judge issued the warrant. Officer Weir knew that the informant had provided information in the past that had resulted in the seizure of illegal drugs on six different occasions, even though his affidavit only included the conclusion that the informant had provided reliable information six times before. Officer Weir knew that the information obtained from informants was that defendants had supplied the methamphetamine found at Rhodenizer's residence about two weeks earlier and that defendants kept enough methamphetamine at their residence to make sales. All of this information establishes that the executing officers reasonably believed that the search warrant was valid, i.e., supported by probable cause.[8]

(4) The final exception to <u>Leon</u>, that the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid, is likewise not applicable here.

---

[7]<u>Illinois v. Gates</u>, 462 U.S. 213 (1983).

[8]Because neither officer testified that he had received training specifically related to preparing affidavits in support of search warrants, it is my fervent hope that they will learn from this opinion and prepare more detailed affidavits in the future.

Such an exception would require that the affidavit allege no more than the possibility that suspects might be involved in crimes. See United States v. Scroggins, 361 F.3d 1075, 1084 (8th Cir. 2004) (the affidavit alleged more than that "unidentified suspects might be involved in violent crimes" and the showing in an affidavit to defeat this exception is "not high").

Based on all of the above, I find that the good-faith exception to the exclusionary rule enunciated in Leon applies to the warrant to search defendants' residence.

## IV. *OVERBROAD AND LACKING IN SPECIFICITY*

Defendant alleges that the search warrant was overbroad and lacked specificity of what material or evidence may be seized.

> [T]he search warrant authorized search and seizure of "other equipment or items utilized to foliate[9] illegal drug activity." This is in the nature of a general search warrant without the required particularity of description of the items to be seized. The police officers seized the 1998 BMW, 1995 Ford Cobra Mustang, and 1995 Chevrolet pickup without specific authorization to seize these vehicles and with no indication that these vehicles were utilized to foliate illegal drug activity. The Waynesville Police Officers actually went to a mechanics garage and seized the 1995 Chevrolet pickup. These are vehicles that the Government is attempting to forfeit in this case. These vehicles were seized outside of the scope of the search warrant. Thus, the seizure is illegal and the vehicles should be returned to Mr. and Mrs. Conant.

(document number 39, page 4, paragraph 11).

The warrant authorizes police to search for and seize the following:

---

[9]I am fairly certain the defendant does not mean to allege that the police were looking for things used to "foliate" illegal drug activity." Indeed, the warrant states that the police may search for items utilized to "facilitate" illegal drug activity.

[I]tems regarding the offenses of possession of a controlled substance with intent to distribute and manufacture of a controlled substance, including methamphetamine and other controlled substances and paraphernalia related to illegal possession and distribution of controlled substances, cash, documentation or records of transactions or amounts owed (electronic or otherwise), weapons, surveillance equipment, communication devices and other equipment or items used to facilitate illegal drug activity[.]

The warrant permitted police to search 609 Sunset Drive, Waynesville, Missouri, described as a single story tan and yellow house with a dark brown garage door. The warrant also includes the following:

This warrant includes the above-described residence, any motor vehicles located on the property that either belong to or are in the control of any person located at the residence at the time of the execution of this search warrant and any late-arriving motor vehicles, and any other area at the residence, including out-buildings, which are in the control of the occupants of the residence or any person located at the residence at the time of the execution of this search warrant. The search is to include any person within or at the above described location or late-arriving during the execution of this Warrant.

Contrary to defendant's argument the warrant authorizes the search of the vehicles on the premises. The evidence establishes that automobile were seized because they were suspected to have been used to facilitate drug trafficking (a drug dog had alerted on all of the cars seized). The warrant specifically authorizes the seizure of motor vehicles.[10] Therefore, the motion to suppress on this basis should be denied.

---

[10]The three vehicles listed by defendant in her motion are specifically listed in the forfeiture counts of the indictment.

## V.  KNOCK AND ANNOUNCE

Defendant alleges that the police entered the home to execute the warrant without first knocking and announcing their purpose.  Generally, officers executing a search warrant must announce their authority and purpose before entering a dwelling without consent. 18 U.S.C. § 3109.  There is, however, an exception to this "knock-purpose" rule when exigent circumstances exist.  Sabbath v. United States, 391 U.S. 585, 591 n. 8 (1968) (citing Ker v. California, 374 U.S. 23, 47 (1963) (Brennan, J., concurring and dissenting)).  Police may enter without knocking "when the officers reasonably believe the persons to be apprehended might destroy evidence during a delay in police entry."  United States v. Tracy, 835 F.2d 1267, 1270 (8th Cir. 1988) (citing Ker v. California, 374 U.S. at 47), cert. denied, 486 U.S. 1014 (1988).

There is no evidence that executing officers failed to knock and announce before entering the residence.

## VI. COPY OF SEARCH WARRANT AND RETURN

Defendant alleges that the police did not provide her with a copy of the search warrant or an inventory of the items seized. Federal Rule of Criminal Procedure 41(f)(1) provides as follows:

> (C) Receipt.  The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

> (D) Return.  The officer executing the warrant must promptly return it -- together with a copy of the inventory -- to the magistrate judge designated on the warrant.  The

officer may do so by reliable electronic means.  The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.

In <u>United States v. Williamson</u>, 439 F.3d 1125, 1132-1133 (9th Cir. 2006), it was undisputed that a copy of the full search warrant was not provided to the occupant of the hotel room; rather, it was left in the hotel at the conclusion of the search but the occupant was arrested and removed from the scene and therefore did not see the warrant.  The Court of Appeals denied that defendant's request to suppress the evidence seized.

"The Supreme Court has repeatedly held that an essential function of the warrant is to 'assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'" [<u>United States v. Gantt</u>, 194 F.3d 987 (9th Cir. 1999)] at 1001 (quoting <u>United States v. Chadwick</u>, 433 U.S. 1, 9 (1977), abrogated on other grounds, <u>California v. Acevedo</u>, 500 U.S. 565 (1991)).  Further, the warrant "give[s] notice to the person subject to the search what the officers are entitled to seize." <u>Id.</u> (internal quotation marks omitted).  Based on notice and assurance concerns, we held that, "[a]bsent exigent circumstances, Rule 41(d)[11] requires service of the warrant at the outset of the search on persons present at the search of their premises." <u>Id.</u> at 1000; see also <u>United States v. Smith</u>, 424 F.3d 992, 1006-07 (9th Cir. 2005). . . .  [W]e have repeatedly held -- and have been instructed by the Supreme Court -- that suppression is rarely the proper remedy for a Rule 41 violation.  The Supreme Court has stated that the Federal Rules of Criminal Procedure do "not constitute a statutory expansion of the exclusionary rule." <u>United States v. Calandra</u>, 414 U.S. 338, 348 n. 6 (1974); see also, e.g., <u>United States v. Johnson</u>, 660 F.2d 749, 753 (9th Cir. 1981) (noting that "[o]nly a 'fundamental' violation of Rule 41 requires automatic suppression, and a violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards" (emphasis added) (internal quotation marks omitted)). . . .

---

[11]Now Rule 41(f).

A legal error does not merit suppression where the mistake has no material effect on the defendant's rights. _See_, e.g., _Chapman v. California_, 386 U.S. 18 (1967). Defendant has not alleged that failure of the police to leave a copy of the warrant at the residence instead of at the jail where defendants had been taken had a material effect on her rights. Therefore, this is not a basis for granting defendant's motion to suppress. Further, because Federal Rule of Criminal Procedure 41(f)(1)(D) requires defendant to request a copy of the inventory, and defendant does not allege that she made a request, her motion to suppress fails on that basis as well.

## VII. SEARCH OF STORAGE UNIT

Defendant states, without any legal authority, that she has standing to challenge the search of the storage unit because "she had the following property stored in that storage unit" and then names 880 Golden Books, a dining room table, her granddaughter's bedroom contents, footlockers, a cedar trunk with family photos and a firearm. Under _United States v. Salvucci_, 448 U.S. 83, 86 (1980), defendant bears the burden of establishing Fourth Amendment standing. Defendant must ultimately prove that she had a legitimate expectation of privacy in the storage unit from which her belongings were recovered. _Rakas v. Illinois_, 439 U.S. 128, 144 (1978).

> As we stated in _Alderman v. United States_, 394 U.S. 165, 174 (1969), "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." _See_ _Brown v. United States_, 411 U.S. 223, 230 (1973); _Simmons v. United States_, 390 U.S. 377, 389

(1968); Wong Sun v. United States, 371 U.S. 471, 492 (1963); cf. Silverman v. United States, 365 U.S. 505, 511 (1961); Gouled v. United States, 255 U.S. 298, 304 (1921).  A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.  Alderman, supra, 394 U.S., at 174.  And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, United States v. Calandra, 414 U.S. 338, 347 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

Rakas v. Illinois, 439 U.S. at at 133-134.

Because defendant alleges no expectation of privacy in the storage unit but only in the items seized, she has no standing to challenge the search of storage unit #33.

Even if I were to find that defendant had standing to challenge this search, I find that there is no basis to suppress the evidence seized from the storage unit.  Defendant's only other argument is that the evidence in this storage unit consists of the fruits of the illegal search of her residence.  As discussed above, the search of her residence was made based on a good-faith reliance on a judge's determination of probable cause and therefore this fruits argument fails.

## VIII. CONCLUSIONS

Based on all of the above, I find that (1) it was objectively reasonable for the officers executing the search warrant at defendant's residence to have relied in good faith on the judge's determination that there was probable cause to issue the warrant; (2) the warrant was not overbroad nor was it lacking in specificity; (3) there is no credible evidence that the police

did not knock and announce their purpose; (4) a copy of the search warrant was left at the jail where defendant had been taken and, even if it should have been left at the residence, suppression of evidence seized is not a proper remedy; (5) defendant has no standing to challenge the search of the storage unit; and (6) the evidence seized from the storage unit does not constitute fruits of an illegal search because the officers were acting in good faith under <u>Leon</u>.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress and amended motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 10, 2014